**68**

DOC NO
REC'D / FILED

JUN 29  11 37 AM '01

# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WISCONSIN

---

**DENNIS JONES'EL, MICHA'EL
JOHNSON, DE'ONDRE CONQUEST,
LUIS NIEVES, SCOTT SEAL, ALEX
FIGUEROA, ROBERT SALLIE, CHAD
GOETSCH, EDWARD PISCITELLO,
QUINTON L'MINGGIO, LORENZO
BALLI, DONALD BROWN, CHRISTOPHER
SCARVER, BENJAMIN BIESE, LASHAWN
LOGAN, JASON PAGLIARINI, and
ANDREW COLLETTE, on behalf of
themselves and all others similarly
situated,**

              **Plaintiffs,**                  **Case No. 00-C-421-C**

      **v.**

**JON LITSCHER, in his official capacity;
GERALD BERGE, in his official and
individual capacities; and DOES 1 – 100,
in their official and individual capacities,**

              **Defendants.**

---

## FIRST AMENDED COMPLAINT

---

PLEASE TAKE NOTICE that Plaintiffs Dennis Jones'El, Micha'el Johnson,

De'Ondre Conquest, Luis Nieves, Scott Seal, Alex Figueroa, Robert Sallie, Chad

Goetsch, Edward Piscitello, Quinton L'Minggio, Lorenzo Balli, Donald Brown,

Christopher Scarver, Benjamin Biese, Lashawn Logan, Jason Pagliarini, and Andrew

Collette, on behalf of themselves and all others similarly situated, by their court-

appointed attorney, Edward R. Garvey, as lead counsel, and co-counsel David C. Fathi,

1

Howard B. Eisenberg, Micabil Diaz Martinez, Robin Shellow, and Pamela R. McGillivray, complain against Defendants Jon Litscher, Gerald Berge, and DOES 1-100 as follows:

## PRELIMINARY STATEMENT

1.     This is a class action brought pursuant to 42 U.S.C. § 1983, seeking declaratory and injunctive relief on behalf of prisoners confined at the Supermax Correctional Institution ("SMCI") in Boscobel, Wisconsin.  This action alleges that by housing prisoners at SMCI, defendants are knowingly subjecting them to conditions that constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States, and are violating their rights under the First, Fourth, and Fourteenth Amendments to the Constitution of the United States, and under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq., as set forth more fully herein.

## JURISDICTION

2.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343(a)(3) because this action seeks to redress the deprivation, under color of state law, of plaintiffs' civil rights.

3.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57.

4.     This Court has jurisdiction to grant injunctive relief pursuant to Fed. R. Civ. P. 65.

## VENUE

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because defendants reside in this district, and because a substantial part of the events and omissions giving rise to plaintiffs' claims occurred in this district.

## PARTIES

6.      Plaintiffs Dennis Jones'El, Micha'el Johnson, De'Ondre Conquest, Luis Nieves, Scott Seal, Alex Figueroa, Robert Sallie, Chad Goetsch, Edward Piscitello, Quinton L'Minggio, Lorenzo Balli, Donald Brown, Christopher Scarver, Benjamin Biese, Lashawn Logan, Jason Pagliarini, and Andrew Collette are prisoners, convicted in Wisconsin circuit courts, who have been sentenced to the Wisconsin state prisons under Chapter 973 of the Wisconsin Statutes.

7.      Defendant Jon Litscher is Secretary of the Wisconsin Department of Corrections ("WDOC"). As such, he is the legal custodian of all prisoners sentenced by the courts of Wisconsin for felony offenses, and is responsible for the safe, secure, and humane housing of those prisoners. At all times relevant hereto, he has acted under color of state law. Defendant Litscher is sued in his official capacity.

8.      Defendant Gerald Berge is Warden of SMCI. As such, he is the legal custodian of all prisoners housed at SMCI, and is responsible for the safe, secure, and humane housing of those prisoners. At all time relevant hereto, he has acted under color of state law. Defendant Berge is sued in his official and individual capacities.

9.      Defendants Does 1-100 are persons who participated in the violations described herein, whose identities are currently unknown to plaintiffs. At all times

3

relevant hereto, they have acted under color of state law. Defendants Does 1-100 are sued in their official and individual capacities.

## STATEMENT OF FACTS

10.     SMCI is a 509-bed facility located in Boscobel, a remote, rural town in western Wisconsin, approximately two hours from Madison and three and a half hours from Milwaukee. Well over half of the prisoners at SMCI come from southeastern Wisconsin. There is no public transportation to Boscobel. It is very difficult for families to visit prisoners at SMCI.

11.     SMCI opened in November 1999 and currently houses approximately 365 prisoners. The Department of Corrections did not request, nor identify a need for, SMCI to be built. Rather, SMCI was the result of a policy and political decision by the Department of Administration.

12.     Although SMCI was ostensibly designed to house "the worst of the worst," many non-violent prisoners have been transferred to SMCI because of unsubstantiated allegations of gang involvement, or to ease overcrowding at other institutions, to build up population at SMCI and thereby reduce the per-capita cost of confining prisoners in that institution, or for no apparent reason at all. African-American prisoners are grossly over-represented at SMCI: The population of SMCI is 61% African-American; the general Wisconsin male prison population is 46% African-American.

13.     According to SMCI's mission statement, it is designed to house prisoners who demonstrate "serious behavioral problems" and provide them the opportunity to acquire skills needed for their integration into the general prison population. However,

4

most of the prisoners at SMCI have not demonstrated "serious behavioral problems" and, for those who do, SMCI offers no programs which provide them with the skills to reintegrate into other institutions.

14.     A prisoner may spend years, or even decades, subjected to the conditions described in this Complaint and may not be released from SMCI until his mandatory release date.

**Conditions of Confinement**

15.     Conditions at SMCI are designed to subject, and do subject, prisoners to almost total social isolation and sensory deprivation.

16.     Prisoners are locked in their cells for 24 hours a day, although some prisoners leave their cells up to four hours per week. The cells are made of concrete walls and a solid "boxcar" door. The cells have no windows. Prisoners never see the outdoors during their entire incarceration at SMCI.

17.     Prisoners at SMCI receive no outdoor exercise, and indeed are never permitted to go outside at all. The only exercise space accessible to prisoners is a windowless concrete cell in which the temperature is the same as that of the outside air. This cell contains little or no exercise equipment. Before prisoners enter and after they exit the recreation cell, they are subjected to a strip search. Because conditions are so harsh, many prisoners choose not to use the recreation cell and simply remain locked in their cells 24 hours a day.

18.     Many prisoners at SMCI are allowed only one 6-minute telephone call per month.

5

19.     Prisoners at SMCI  are permitted no family or other personal visits, except "video visits" in which the prisoner and his visitor see each other only on a video screen, which provides distorted, delayed, and poor quality images.  Due to the remote location of SMCI and the burdensome requirements SMCI imposes on visitors, many prisoners do not even receive these "video visits."  WDOC has the technology to provide distance visiting by video, which would allow families to visit a prisoner without traveling to SMCI, but has failed to provide that option to families.

20.     Prisoners' cells are illuminated 24 hours a day, and prisoners are instructed to sleep without covering their heads.  Those who do not comply are awakened hourly throughout the night by security staff.  These conditions result in chronic sleep deprivation, as well as physical symptoms including chronic headaches and eye pain, and psychological symptoms including confusion and depression.

21.     Prisoners are monitored by security staff, both in person and via video camera, 24 hours a day.  As a result, male prisoners are sometimes watched at close range by female security staff as they undress, shower, masturbate, urinate, and defecate. Female security staff have sometimes commented on prisoners' genitals within the prisoners' hearing.

22.     Plaintiff Micha'el Johnson, like all other prisoners at SMCI, has been subjected to all of the conditions of confinement set forth above, and has suffered physical and psychological pain and physical injury as a result.

**Extreme Temperatures**

23.     Due to poor temperature control at SMCI, prisoners are subjected to both extreme heat and extreme cold.  Plaintiffs Dennis Jones'El and Micha'el Johnson, like all

6

other prisoners at SMCI, have been subjected to these extreme temperatures, and have suffered physical and psychological pain and physical injury as a result.

**Cell Searches and Strip Searches**

24.     Prisoners at SMCI are frequently subjected to searches of their cells, as well as strip searches and body cavity searches of their person. Often searches are not conducted for legitimate security purposes, but to humiliate and harass. Plaintiff Micha'el Johnson, like all other prisoners at SMCI, has been subjected to these searches. Plaintiff Micha'el Johnson has been subjected to at least 22 of these searches, including four in a single month.

**Medical, Mental Health, and Dental Care**

25.     Medical, mental health, and dental care at SMCI are wholly inadequate. An October 2000 report by the National Commission on Correctional Health Care ("NCCHC") noted a "backlog of mental health and dental requests." The report further noted that there were many grievances filed by prisoners "due to serious issues regarding delayed dental and psychiatric services and in general being denied medical treatment." The report also noted a "great deal of nursing staff turnover," and observed that there was no continuous quality improvement ("CQI") program for health services at SMCI.

Medical Care

26.     Medical care at SMCI is systemically inadequate. According to a May 2001 report by the Wisconsin Legislative Audit Bureau ("Legislative Audit"), over one-quarter of SMCI prisoners suffer from a chronic illness. Defendants have failed to provide the medical staff and other resources to properly care for the serious medical needs of these chronically ill prisoners.

7

27.     Medical care at SMCI is provided by a private, for-profit contractor. The Legislative Audit concluded that this contractor has not provided the medical services contracted for at SMCI.

28.     As a result of inadequate medical staffing or defendants' deliberate indifference, prisoners at SMCI do not receive necessary treatment for painful, debilitating, and sometimes life-threatening conditions.

29.     Plaintiff De'Ondre Conquest suffers from terminal stomach cancer. Since entering SMCI, he has lost 56 pounds. He requires catheterization with the assistance of medical staff personnel in order to urinate. On one occasion, no one came to catheterize him all day. He also must take strong medication to control pain caused by his disease. One of the medications, Oxycodone, is to be taken as needed, up to once every three hours. He often fails to receive his Oxycodone as needed, with the result that he suffers severe pain.

30.     Plaintiff Luis Nieves suffers from epilepsy. On July 31, 2000 at 4:00 pm, he told a nurse that he felt symptoms of a seizure coming on, but the nurse did nothing. He then pushed the emergency call button; a nurse came 15 minutes later. The nurse told Mr. Nieves that she would inform Dr. Jones and had Mr. Nieves fill out some paperwork. No other medical staff came to his cell until 9:45 pm, when the nurse returned to deliver medication. By that time, however, Mr. Nieves had already suffered a seizure. On September 28, 2000, Mr. Nieves again felt a seizure coming on. However, he was refused medical attention because the video camera in his cell was covered. The next morning, he suffered a seizure.

8

31.  Plaintiff Scott Seal has a torn rotator cuff in his shoulder. He was originally told by Dr. Jones to rest the shoulder and take anti-inflammatory drugs. He did this for several months, but the pain continued. Dr. Riley saw him but did not conduct any tests beyond looking for surface defects. The pain continues, and it has been nine months since he reported the shoulder injury. He has received no other medical treatment for his injury.

32.  Plaintiff Alex Figueroa was transported from SMCI to University Hospital in Madison in January 2001 to have a kidney stone removed. During the procedure, his kidney was punctured. On the ride back to SMCI, he was vomiting and bleeding out of a tube that ran from his kidneys. Once back at SMCI, he was in severe pain, saw blood in his urine, and broke out in hives from his medication. On January 23 and 24, 2001, he pressed his emergency call button because he was in severe pain. On both days, no one responded for an hour and a half. When staff did respond, they treated his pain but did nothing about the blood in his urine.

Mental Health Care

33.  Mental illness is endemic at SMCI. Although WDOC initially provided by policy that no mentally ill prisoners would be transferred to SMCI, that policy has been abandoned, if it was ever in effect. Although WDOC maintains no statistics on the number of prisoners who have been diagnosed with a mental illness, the Legislative Audit concluded that at least 15% of SMCI prisoners are mentally ill.

34.  The conditions described in this Complaint make SMCI an incubator of psychosis. Previously mentally healthy prisoners become mentally ill as a result of confinement under these conditions. With regard to prisoners who are already mentally

9

ill upon their arrival, conditions at SMCI cause serious and sometimes catastrophic deterioration in their mental health. As a result, numerous prisoners at SMCI hear voices and are obsessed with suicidal thoughts; others smear feces, swallow metal objects, cut their flesh, attempt suicide by drug overdose, attempt to hang themselves, and otherwise attempt to harm or kill themselves.

35.     Despite this overwhelming need, mental health care at SMCI is systemically inadequate. The October 2000 NCCHC report noted that two out of three psychologist positions, as well as the only psychiatrist position, were vacant. Although SMCI was originally planned to have a full-time psychiatrist, it now has only four hours per week of psychiatrist time; as recently as October 2000, it had two hours per week of psychiatrist time. Because defendants failed to provide adequate qualified staff and other mental health resources, the needs of the serious mentally ill have often been ignored.

36.     Plaintiff Christopher Scarver has been incarcerated at SMCI since April 11, 2000. He has suffered from mental health problems such as anxiety and hearing voices for many years, and in 1992 was diagnosed as having either schizophrenia or bipolar disorder. Since his transfer to SMCI, his mental health problems have worsened. He has begun to feel suicidal. On May 12, 2001, Mr. Scarver attempted suicide by swallowing 30 tablets of Thorazine. He is not receiving adequate psychiatric treatment at SMCI and is unable to advance through the level system due to his illness.

37.     Plaintiff Scott Seal suffers from severe depression and anxiety. At SMCI, Dr. Hagen gave him a book to enhance his mental health, but this was confiscated by the guards because Mr. Seal's level at the time (level one) did not allow any programming.

10

He had also taken the drug Paxil to control his symptoms, but the medication was switched as a cost-saving measure.

38.     Plaintiff Benjamin Biese has been diagnosed with multiple mental illnesses, including bipolar disorder, obsessive compulsive disorder, and severe personality disorder.  Mr. Biese has been in poor mental health since the age of six.  He has received treatment for these conditions at Mendota Mental Health Institute ("MMHI").  As a result of lengthy waiting periods to see the psychiatrist at SMCI or deliberate indifference, Mr. Biese has not received appropriate psychiatric care.  His symptoms, including impulsiveness and drastic mood swings, have intensified since his placement at SMCI.

Dental Care

39.     Dental care at SMCI is systemically inadequate.  Although SMCI was originally planned to have at least one full-time dentist, it now has only four hours a week of dentist time.  Because of defendants' deliberate indifference or failure to provide adequate staff and resources, even prisoners with painful and debilitating dental conditions must wait months for treatment.

40.     Plaintiff Micha'el Johnson was denied access to a toothbrush at SMCI.  Instead, he was instructed to brush his teeth with a contraption that is fitted on the end of the finger, and has small plastic spikes rather than bristles.  When he attempted to brush his back teeth, this device slipped off his finger, causing him to choke on the device.  In addition to causing him to choke, use of this device caused him to suffer bleeding gums, choking, and lacerations.  As a result of the use of this device, and a denial of needed dental care, Mr. Johnson suffered extreme pain and physical injury, and developed a

dental condition known as pericoronitis. This suffering was not unique to Mr. Johnson; the October 2000 NCCHC report noted "a number of complaints regarding the inadequacy of the toothbrush" provided to SMCI prisoners.

41.    Plaintiff Dennis Jones'El suffered an abscess because of inadequate dental care at SMCI. SMCI would not provide him with a needed root canal. Also, because of delays in dental care, he has suffered extreme pain and physical injury, including bleeding gums and cavities.

42.    Plaintiff Robert Sallie has only canines and one back molar, and has been directed by his dentist to wear a denture to enable him to eat solid foods. Beginning in December 1999, he needed work done on his denture, but SMCI refused to have that work done. As a result, he was unable to use his denture to chew his food and suffered painful gums from eating without his denture. On July 13, 2000, Mr. Sallie again requested that his denture be repaired. He was told that because the dentist is only at SMCI for limited hours, only people with an emergency could be seen. Mr. Sallie's problem was not considered an emergency, so he was placed on a waiting list. He made an additional complaint on August 29, 2000 and was again told that the dentist is working on an emergency basis only.

43.    Plaintiff Luis Nieves has tried to receive dental services since he arrived at SMCI, but his requests have been denied. He was told that the dentist has a limited schedule and was on a three-week vacation. Mr. Nieves could not be seen because his condition was not an emergency, although no dental personnel examined him to make that determination.

12

44.     Plaintiff Chad Goetsch has asked to have his teeth cleaned, but these requests have been refused. He complained after waiting eighteen months but was told that because the dentist only sees people on a priority basis, the dentist can only clean teeth if he has time.

**Excessive Force**

45.     Excessive force is an everyday occurrence at SMCI. This excessive force is directed disproportionately, although not exclusively, at mentally ill prisoners. Due to the oppressive conditions of confinement and inadequate mental health services at SMCI, prisoners become mentally ill, or their mental illness worsens. Custodial staff are not properly trained in the identification and management of mentally ill prisoners. Thus, when prisoners manifest their illness by self-harm or other behaviors, SMCI staff often respond with force rather than with appropriate mental health interventions.

46.     Custodial staff at SMCI shock prisoners with electroshock weapons including, but not limited to, the "Ultron II." The Ultron II is an electroshock weapon that is placed against the prisoner's body, and emits a powerful and painful electric shock, often leaving burn marks on the skin.

47.     Use of the Ultron II constitutes potentially lethal force, particularly with prisoners who have heart trouble or other chronic health conditions. The Virginia Department of Corrections recently suspended use of the Ultron II after it was implicated in the death of a prisoner.

48.     Plaintiff Andrew Collette has many chronic mental health problems, including impulse control disorder, antisocial personality disorder, and hearing voices. He was also prescribed medication for bipolar disorder in August 2000. He has had the

13

Ultron II stun gun and stun shield used on him on numerous occasions. On October 27, 2000, guards came to his cell because he had covered his cell windows and video camera. They brought with them the stun shield. When Mr. Collette would not comply with orders, he was stunned 10-15 times with the stun shield. He was later refused treatment by a nurse for the pain and injuries caused by the stun shield.

49.    Plaintiff Christopher Scarver is seriously mentally ill. On December 10, 2000, a guard observed Mr. Scarver trying to cut himself with a razor. The guard sprayed mace at him. Mr. Scarver was given a citation for destruction of property in regards to the razor.

50.    When returning to his cell after viewing his records, plaintiff Luis Nieves noticed that some of his property was missing and asked to see a supervisory officer. A guard then shoved Mr. Nieves into his cell with excessive force and shut the door, without removing his handcuffs. On another occasion, while Mr. Nieves was being strip searched, a guard grabbed Mr. Nieves' head with excessive force and pressed a finger into his neck in an effort to open his mouth. Mr. Nieves received a bruise on his neck from this incident and had to take medication for the pain. On September 16, 2000, Mr. Nieves was told he was going to be placed in control. While he was kneeling down, a cell extraction team came in to restrain him. They slammed his head against the wall and Mr. Nieves lost consciousness briefly. When he regained consciousness, he was being handcuffed and taken out of the cell.

**Violation of Religious Freedom**

51.    Prisoners of various religious faiths are denied access to sacred texts and objects that are necessary to their religious exercise.

14

52.     Defendants impose substantial burdens on plaintiffs' religious exercise. These burdens are not rationally related to legitimate penological objectives. Moreover, these burdens are not imposed in furtherance of a compelling governmental interest; nor are they the least restrictive means of furthering a compelling governmental interest.

53.     These substantial burdens affect, and removal of these substantial burdens would affect, commerce with foreign nations and among the several states.

54.     WDOC and SMCI receive Federal financial assistance.

55.     Plaintiffs Dennis Jones'El and Micha'el Johnson are Muslims. They have been denied hardcover Korans (holy books), kufis (head coverings), and prayer rugs. These objects are necessary for their religious observance.

56.     Plaintiff Edward Piscitello requested access to a Bible correspondence course, but was told that SMCI does not allow prisoners to participate in any correspondence courses. He was told to view this as an incentive to behave and get transferred back to a less restrictive facility. However, because Mr. Piscitello has been placed at SMCI ostensibly for his own protection, rather than for any behavioral problems, it is highly unlikely he would be released from SMCI for "good behavior."

57.     Plaintiff Quinton L'Minggio has been a Muslim since 1988 and speaks and writes Arabic. He was denied access to certain religious materials, including Muslim books, that he needed to study Islam and for daily prayers. He was also not allowed to participate in a Muslim feast held at the end of Ramadan, because he complained that it was not being held at the correct time. Additionally, the fact that female officers can see him nude when he is showering violates his religious beliefs.

58.     Plaintiff Lorenzo Balli is a Native American. He sought to have sacred Native American items in his cell, such as eagle feathers, a headband, drum, sage, cider, and sweet grass, which are necessary to his religious practice and pose no threat to security. Mr. Balli was denied these items.

59.     Plaintiff Donald Brown is a devout Christian. On December 14, 1999, SMCI officers told him he would not receive his dinner unless he submitted to a cell search because he was going on paper restriction, under which prisoners are allowed to keep only one paper item in their cell at a time. He submitted to the search and when he returned to his cell, he found a large stack of legal papers and a full roll of toilet paper were still there. The officers had, however, removed his Bible. SMCI has restricted Mr. Brown's practice of religion as a disciplinary tool.

**Deprivation of Liberty and Property Without Due Process of Law**

60.     As a result of the foregoing conditions at SMCI, prisoners are subjected to a regime of deprivation and enforced idleness that is unique in the WDOC. Plaintiffs are subjected to denial of privileges, restrictions on protected and discretionary activities, and limitations on educational and employment opportunities that are more onerous than those at any other Wisconsin prison. Access to legal materials and legal counsel is far more restricted at SMCI than at any other Wisconsin prison. SMCI prisoners are also subject to a unique behavior modification program, known as the "level system."

61.     The solitary confinement, denial of privileges, additional regulations and restrictions on protected and discretionary activities, the limitation on educational and employment opportunities, the lack of access to legal materials and legal counsel, the behavior modification program, and other programs and conditions at SMCI impose an

16

atypical and significant hardship on plaintiffs in relation to the ordinary incidents of prison life in the Wisconsin prison system.

62.     The actual and anticipated duration of the confinement at SMCI under such conditions also result in an atypical and significant hardship on plaintiffs in relation to the ordinary incidents of prison life in the Wisconsin prison system.

63.     Placement at SMCI, for those plaintiffs who are or will be eligible for discretionary release, will inevitably result in such plaintiffs spending more time in confinement than had they not been placed in SMCI.  This is because of the length of time required to complete the program at SMCI, the stigma that attaches to any prisoner who has been confined at SMCI for any reason, and the resulting reluctance of defendants and other WDOC officials to grant discretionary release to persons who have been confined at SMCI.

64.     The State of Wisconsin, through its legislature and governor, intended that SMCI be utilized to house only the "worst" and most dangerous prisoners in the Wisconsin prison system, who could not be safely housed in traditional maximum security prisons in the State.  Such prisoners include those who, by demonstrated prior conduct, pose a high risk of escape, a high risk of assaultive misconduct, or a high risk of other conduct likely to cause harm to themselves or others.

65.     The majority of plaintiffs do not meet these mandatory criteria for placement at SMCI and placement at SMCI is arbitrary and capricious.

66.     Plaintiffs have a liberty and property interest, protected by the Fourteenth Amendment to the United States Constitution, in remaining out of SMCI.

17

67.     Before being placed at SMCI plaintiffs were denied hearings which
complied with due process of law as required by <u>Wolff v. McDonnell</u>, 418 U.S. 539
(1974) and <u>Bono v. Saxbe</u>, 620 F.2d 609, 618 (7th Cir.1980), to determine that they met
the criteria for placement at SMCI and that such decision was based on credible and
reliable evidence.

68.     Plaintiff Donald Brown has been incarcerated at SMCI since December
12, 1999. In November 1994, he was placed on Administrative Confinement. He
participated in many counseling programs and became a devout Christian. He regretted
his past mistakes and felt he had turned his life around. On May 11, 1999 at an
administrative confinement hearing, the committee unanimously recommended release
from Administrative Confinement pending completion of a clinical treatment program at
the Wisconsin Resource Center ("WRC"), a mental health treatment facility for prisoners.
The committee recommended unanimously that Mr. Brown be transferred to WRC in
medium security and noted that he had not misbehaved since November 1994. Despite
all of this, Mr. Brown was transferred to SMCI on December 12, 1999. Records from
WDOC Social Services state that he was supposed to go to WRC but instead came to
SMCI when it opened. A note in his SMCI file dated October 10, 2000 states that "no
one knows why he's here," and a note dated October 24, 2000 states that there are "no
good explanations" for why he is at SMCI.

69.     Plaintiff De'Ondre Conquest is a non-violent offender imprisoned for a
drug charge, with no history of violence in or out of the prison system. Additionally, he
has terminal cancer. He was transferred to SMCI because he allegedly sold his pain
medication to another prisoner.

18

70.     Plaintiff Scott Seal is incarcerated for driving after license revocation. He has no history of violence in or out of custody. He was transferred to SMCI because he had a consensual sexual relationship with a female guard at Oshkosh Correctional Institution, causing him to be erroneously labeled "predatory to staff."

71.     Plaintiff Lashawn Logan was transferred to SMCI on January 10, 2001, when he was only 17 years old. He was incarcerated for car theft and possession of THC with intent to deliver. He has no history of violent behavior, but was transferred to SMCI for possible gang affiliation.

72.     Plaintiff Edward Piscitello is housed at SMCI ostensibly for his own protection. Since first being incarcerated in 1991, he has committed no violent acts and exhibited no behavioral problems in the prison system. He has had no problems with other prisoners, and does not believe placement at SMCI is necessary for his protection. He was told by the Program Review Committee ("PRC") that he would be transferred to SMCI; no incident preceded that determination by the PRC.

73.     Plaintiff Benjamin Biese was incarcerated at SMCI from February 16, 2000 to February 15, 2001. He was then transferred to MMHI to receive treatment for his multiple mental illnesses, including bipolar, obsessive compulsive, and severe personality disorders. On June 25, 2001, he was told him MMHI staff that he was being transferred back to SMCI. He was given no explanation for the transfer.

74.     Plaintiff Jason Pagliarini is a non-violent offender, having been convicted of auto theft and burglary when he was 18 years old. On October 10, 2000, he was transferred to SMCI from Jackson Correctional Institution, a medium security facility, for accepting money from the girlfriend of another prisoner. At his PRC hearing, he was

19

denied the opportunity to speak on his own behalf and told that the decision to transfer

him had been made two weeks prior to the hearing. He has no history of violent behavior

while incarcerated as well as no prior juvenile record.

**General Factual Allegations**

75.   The conditions described in this Complaint result in gratuitous pain and

suffering, and pose an imminent danger of serious illness, injury, or death to plaintiffs.

76.   In imposing the conditions described in this Complaint, defendants have

acted with deliberate indifference to plaintiffs' serious medical, health, and safety needs,

and to the risk that plaintiffs will suffer serious illness, injury, or death.   The conditions

described herein are not reasonably related to legitimate penological objectives.

77.   The conditions described in this Complaint are likely to persist unless

enjoined by this Court.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

78.   All plaintiffs have exhausted such administrative remedies as are available

to them.

## CLASS ACTION FACTS

79.   Plaintiffs bring this action on behalf of themselves and all others similarly

situated, pursuant to Fed. R. Civ. P. 23(a) and (b)(2), and pursuant to the Court's Order of

February 15, 2001.

80.   Plaintiffs seek to represent a class consisting of:

> All persons who are now, or will in the future be, confined in the
> Supermax Correctional Institution in Boscobel, Wisconsin.

81.   The members of the class are too numerous, and the membership of the

class too fluid, to permit joinder of all members.   There are currently approximately 365

prisoners confined at SMCI.  Because prisoners are sometimes transferred between SMCI

and other prisons, the membership of the class changes constantly.

82.     Common questions of law and fact exist as to all class members.  All class

members are equally subject to the unconstitutional and unlawful conditions at SMCI

described in this Complaint.  These common questions include, but are not limited to:

> Whether conditions of confinement at SMCI violate the First,
> Eighth, and Fourteenth Amendments to the United States
> Constitution;

> Whether the systemically inadequate medical, mental health, and
> dental care at SMCI violate the Eighth and Fourteenth
> Amendments to the United States Constitution;

> Whether the use of excessive force at SMCI violates the Eighth
> and Fourteenth Amendments to the United States Constitution;

> Whether the policy and practice of conducting searches at SMCI
> violate the Fourth, Eighth, and Fourteenth Amendments to the
> United States Constitution;

> Whether subjecting prisoners to constant surveillance, including
> surveillance by female officers while undressing, showering, and
> using the toilet, violates the First, Fourth, Eighth, and Fourteenth
> Amendments to the United States Constitution, and the Religious
> Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, et
> seq.;

> Whether defendants' interference with prisoners' religious exercise
> violates the First and Fourteenth Amendments to the United States
> Constitution, and the Religious Land Use and Institutionalized
> Persons Act, 42 U.S.C. § 2000cc, et seq.;

> Whether the process by which plaintiffs were transferred to SMCI
> deprived them of liberty or property without due process of law.

83.     The claims of the named plaintiffs are typical of those of the class.

84.     Plaintiffs will fairly and adequately represent the interests of the class.

The interests of plaintiffs are consistent with those of the class, and they are represented

by counsel who are experienced in class action, civil rights, and prison conditions litigation.

85.     Defendants have acted and refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole.

## CAUSES OF ACTION

86.     By subjecting plaintiffs to the conditions of confinement set forth herein, with full knowledge of those conditions, defendants have acted, and continue to act, with deliberate indifference to plaintiffs' serious health and safety needs, and have violated the First, Eighth, and Fourteenth Amendments to the United States Constitution.

87.     By subjecting plaintiffs to the systemically inadequate medical, mental health, and dental care described herein, defendants have acted, and continue to act, with deliberate indifference to plaintiffs' serious medical needs, and have violated the Eighth and Fourteenth Amendments to the United States Constitution.

88.     By subjecting plaintiffs to the regime of excessive force described herein, defendants have acted, and continue to act, with deliberate indifference to plaintiffs' serious health and safety needs, and have violated the Eighth and Fourteenth Amendments to the United States Constitution.

89.     By subjecting plaintiffs to searches that are unrelated to prison security and are calculated to harass, defendants have violated the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

90.     By subjecting plaintiffs to constant surveillance, including surveillance by female officers while undressing, showering, and using the toilet, defendants have

violated the First, Fourth, Eighth, and Fourteenth Amendments to the United States
Constitution, and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §
2000cc et seq.

91.     By interfering with plaintiffs' religious freedom as set forth herein,
defendants have violated the First and Fourteenth Amendments to the United States
Constitution, and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §
2000cc et seq.

92.     By transferring plaintiffs to SMCI without a hearing at which is presented
credible and reliable evidence showing that each prisoner, on the basis of his prior
documented conduct, meets the criteria for placement at SMCI, defendants have violated
the Fourteenth Amendment to the United States Constitution.

## DAMAGES CLAIMS BY PLAINTIFFS JONES'EL AND JOHNSON

93.     As a result of the statutory and constitutional violations set forth above,
plaintiffs Jones'El and Johnson have suffered physical injury, as well as extreme physical
and mental pain and suffering.  Defendants have acted with malice toward plaintiffs
Jones'El and Johnson, or with reckless indifference to their rights.

94.     Plaintiffs Jones'El and Johnson demand trial by jury on their damages
claims.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court:

1.     Issue a judgment declaring that the actions of defendants described herein
are unlawful and violate plaintiffs' rights under the Constitution and laws of the United
States;

23

2.      Permanently enjoin defendants, their subordinates, agents, employees, and all others acting in concert with them, from subjecting plaintiffs to the conditions set forth in this Complaint;

3.      Grant compensatory and punitive damages to plaintiffs Jones'El and Johnson;

4.      Grant plaintiffs their reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988 and other applicable law; and

5.      Grant such other relief as the Court considers just and proper.

Dated this 29th day of June, 2001.

**Attorneys for Plaintiffs**

Edward R. Garvey
Pamela R. McGillivray
GARVEY & STODDARD, S.C.
634 W. Main Suite 201
Madison, WI 53703
Telephone: (608) 256-1003
 Fax: (608) 256-0933

David C. Fathi
National Prison Project of the
ACLU Foundation
733 15th Street N.W., Suite 620
Washington, DC 20005
Practice limited to Federal Courts

Howard B. Eisenberg
Attorney at Law
P.O. Box 1476
Milwaukee, WI 53201-1476

Micabil Diaz Martinez
ACLU of Wisconsin Foundation
207 E. Buffalo Street, Suite 325
Milwaukee, WI 53202

Robin Shellow
The Shellow Group
324 W. Vine Street
Milwaukee, WI 53212

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

JUL 6 - 2001

**DENNIS JONES'EL, MICHA'EL
JOHNSON, DE'ONDRE CONQUEST,
LUIS NIEVES, SCOTT SEAL, ALEX
FIGUEROA, ROBERT SALLIE, CHAD
GOETSCH, EDWARD PISCITELLO,
QUINTIN L'MINGGIO, LORENZO
BALLI, DONALD BROWN, CHRISTOPHER
SCARVER, BENJAMIN BIESE, LASHAWN
LOGAN, JASON PAGLIARINI, and
ANDREW COLLETTE, on behalf of
themselves and all others similarly
situated,**

                    **Plaintiffs,**

                                                    **Case No. 00-C-421-C**

          v.

**JON LITSCHER, in his official capacity;
GERALD BERGE, in his official and
individual capacities; and DOES 1 – 100,
in their official and individual capacities,**

                    **Defendants.**

---

**AFFIDAVIT OF SERVICE**

---

STATE OF WISCONSIN)
                                    ) ss.
COUNTY OF DANE      )

          **NOW COMES** Pamela R. McGillivray, an attorney with the law firm of Garvey
& Stoddard, S.C., upon oath, deposes and states as follows:

          1)        That on the 29th day of June, 2001, I filed an original Amended Summons
and Complaint in the above-referred-to matter with the U.S. District Court, Western
District of Wisconsin.

          2)        That on the 29th day of June, 2001, I served an authenticated copy of the
Amended Summons and Amended Complaint on the following persons at the addresses
stated, to-wit:

2)    That on the 29th day of June, 2001, I served an authenticated copy of the Amended Summons and Amended Complaint on the following persons at the addresses stated, to-wit:

> Jill Brault
> Wisconsin Department of Justice
> 123 W. Washington Avenue
> Madison, Wisconsin 53707-7857

> Donna J. O'Connell
> Office of the Attorney General
> State Capitol
> Madison, Wisconsin 53702

Pamela R. McGillivray

Subscribed and Sworn to before me
this 29th day of June, 2001.

Notary Public, State of Wisconsin
My Commission is permanent